Fred A. LAWSON, Plaintiff,

v.

GETTY TERMINALS CORP. and Gordon Rodgers, Individually and in his Capacity as Terminal Manager for Getty Terminals Corp., Defendants.

No. 93 Civ. 3344(SWK).

United States District Court, S.D. New York.

Nov. 2, 1994.

Law Office of C. Vernon Mason, New York City, by Howard L. Wieder, for plaintiff.

Law Offices of Robert G. Del Gadio, Uniondale, NY, by Robert G. Del Gadio, for defendants.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

In this employment discrimination action, defendants Getty Terminals Corp. ("Getty") and Gordon Rodgers ("Rodgers") move, pursuant to Federal Rule of Civil Procedure 56, for summary judgment dismissing the complaint in its entirety. Alternatively, defendants move, pursuant to Rule 56, for partial summary judgment (1) dismissing that portion of the complaint that fails to establish a *prima facie* case; (2) dismissing plaintiff's claim for punitive damages; and (3) limiting compensatory damages to the sum of $50,-000. For the reasons set forth below, defendants' motion for summary judgment is granted and the complaint is dismissed in its entirety.

## BACKGROUND [1]

### I. Employment at the Newark Terminal

Defendant Getty operates a gasoline terminal at 86 Doremus Avenue, Newark, New Jersey (the "Newark Terminal"), which receives and distributes gasoline to Getty gasoline stations. The Newark Terminal operates seven days per week, 24 hours per day. Five terminal supervisors work at the Newark Terminal according to a schedule of day, evening and night shifts.

Terminal supervisors are responsible for supervising the daily operation of the truck fleet at the terminal including, *inter alia*, (1) receiving product; (2) gauging storage tanks; (3) reconciling product disbursements with book inventory; (4) preparing delivery schedules; (5) supervising terminal personnel; (6) verifying product quantity received at the terminal; and (7) dispatching deliveries. As most truck maintenance and repairs take place during the day, the responsibilities of the terminal supervisors on the day shift are greater than those on the night shift.

On July 11, 1985, plaintiff Fred A. Lawson ("Lawson"), an African–American male, commenced employment at Getty as a tractor-trailer driver. On February 18, 1986, Lawson was promoted to the position of terminal foreman on the night shift at the Newark Terminal.[2] In March 1989, the job title for terminal foreman was changed to terminal supervisor.

In July 1990, defendant Rodgers commenced employment as a terminal superintendent in charge of all terminal supervisors at the Newark Terminal. Rodgers designated Willie Smith Jr. ("Smith"), an African–American male, as the direct supervisor of

---

1. Unless otherwise noted, the following statement of undisputed facts is taken from the complaint; Affidavit of Gordon William Rodgers, sworn to on December 22, 1993; Statement of Material Facts Claimed Not to be in Dispute in Accordance with Rule 3(g); Exhibits to Memorandum of Law and Affidavit of Gordon William Rodgers ("Exhibits"); Statement in Accordance with Rule 3(g); Affidavit of Fred Lawson, sworn to on March 4, 1994; Affidavit of Stanley Bittner, Jr., sworn to on January 21, 1994 (the "Bittner Aff."); and Affidavit of Ivan Janovsky, sworn to on January 27, 1994 (the "Janovsky Aff.").

2. According to defendant Rodgers, newly-employed terminal supervisors are placed on the day shift for approximately six months of training. Lawson contends, however, that he received no training for the position of terminal supervisor.

the remaining terminal supervisors, including Lawson. Smith was the most senior terminal supervisor at Newark Terminal with more than twenty years of experience. The other terminal supervisors during the course of Lawson's employment included: (1) Raymond Joseph Cody ("Cody"), a white male; (2) Stanley Bittner ("Bittner"), a white male, who held the position of terminal supervisor from 1985 until he was discharged on April 12, 1993; (3) Kenneth Sharpe ("Sharpe"), an African–American male, who was promoted to the position of terminal supervisor on April 14, 1993 to replace Bittner; (4) Ivan Janovsky ("Janovsky"), a white male, who held the position of terminal supervisor from March 1985 until he was discharged on August 8, 1988; (5) Joseph McGrath ("McGrath"), a white male, who replaced Janovsky and held the position of terminal supervisor from July 1989 until October 2, 1992; (6) John L. Kerper ("Kerper"), a white male, who acquired the responsibilities of terminal supervisor in addition to his responsibilities as lube oil manager after McGrath was discharged; and (7) Donato Gallucci ("Gallucci"), a white male, who worked at the Newark Terminal from December 1988 until April 1989. Gallucci had been employed with Getty from March 1981 until October 1986 as a terminal foreman at Getty's Mount Vernon Terminal. On April 28, 1989, he was transferred back to the Mount Vernon Terminal at the same rate of pay.

On February 12, 1991, Rodgers arranged for Lawson and McGrath to share a swing shift wherein Lawson worked for three months on the afternoon shift while McGrath worked on the night shift, followed by three months in which Lawson and McGrath switched shifts. On February 10, 1992, when Lawson returned to the day shift, Rodgers contends that it became apparent that Lawson was unable to handle the responsibilities of the shift.

## II. Lawson's Job Performance

According to Rodgers, Lawson failed to perform the requirements of his job in a satisfactory manner, including failing to follow company policy and procedure and making numerous careless errors. Specifically, Rodgers contends that, upon encountering a problem on his shift, Lawson failed to make decisions, instead asking other people to make decisions for him. In addition, Lawson was often reprimanded for failing to complete work before the end of his shift. For example, terminal supervisors are required to complete an inventory report listing the amount of product in each gasoline tank at the end of their shifts. The terminal supervisor is then required to reconcile this amount with the book inventory. According to Rodgers, Lawson frequently failed to investigate discrepancies between the physical inventory and the book inventory, instead leaving the discrepancy for the terminal supervisor on the next shift to reconcile.

Terminal supervisors are also required to complete an inventory gauge book. Rodgers contends that he "constantly" reprimanded Lawson for failing to complete the log book. Lawson also failed to enter accurate data on inventory and "run out" reports.[3] In addition, Lawson often precluded barges from discharging their product offshore by failing to relieve the terminal operator on the dock so that the terminal operator could take a physical inventory of the product at the terminal.

Terminal supervisors are also responsible for filling out surcharge forms charging station operators for delivery problems. Rodgers contends that Lawson frequently failed to surcharge station operators and, when he did fill out the surcharge form, often filled it out inaccurately. In addition, Lawson often failed to notify station operators of any changes in delivery schedules and failed to modify delivery schedules to accommodate station operators.

On February 5, 1992, a driver who was scheduled to make a delivery to Pennsylvania did not have the proper fuel tax sticker on his truck. In order to attach the trailer to a truck with a proper sticker, Lawson instructed the driver to drop his loaded trailer under

---

**3.** Terminal supervisors are required to fill out a "run out" report when a station operator runs out of gasoline.

the loading racks. This procedure violated company policy, however, and Rodgers contends that dropping a trailer full of gasoline under the loading racks could have led to serious safety problems.

### III. Annual Performance Review and Probationary Period

In January 1992, Rodgers performed an annual review of Lawson's job performance, giving him an overall rating of between "competent" and "marginal." Rodgers concluded that "Fred must exert himself and make significant progress to maintain his position in the department." *See* Job Performance Review, dated January 27, 1992, annexed to the Exhibits as Exh. "S," at 2.

Prior to Lawson's review, Rodgers informed Lawson that he was dissatisfied with Lawson's performance. Rodgers indicated that, as a result of Lawson's poor performance, he would no longer be permitted to share the swing shift with McGrath, and that, instead, he would be placed permanently on the night shift. In addition, on February 11, 1992, Smith verbally counseled Lawson regarding Lawson's failure to fulfill his responsibilities as a terminal supervisor.

On February 14, 1992, Lawson complained to Maureen Hunstein ("Hunstein"), an employee in Getty's human resources department, that he believed he was being discriminated against because he was not permitted to work on the day shift. Subsequently, on February 19, 1992, Rodgers informed Lawson that he was being placed on probation for ninety days as a result of his poor job performance. Thereafter, on February 24, 1992, Lawson requested an outline of his job responsibilities as terminal supervisor and on March 9, 1992, Rodgers provided Lawson with a job description. The next day, Smith discussed Lawson's responsibilities with him and Lawson signed a memorandum signifying that he fully understood his responsibilities as terminal supervisor.

Nevertheless, Rodgers contends that Lawson continued to perform his job responsibilities in an unsatisfactory manner. Specifically, on April 9, 1992, Lawson failed to reconcile the book inventory with the physical inventory and made no investigation to determine the reason for the discrepancy. That same day, Lawson failed to report information regarding a station delivery. On April 28, 1992, Lawson failed to fill out a violation report correctly. On May 31, 1992, Lawson did not inform a driver to surcharge a customer for his failure to take a delivery as ordered. On June 15, 1992, Lawson failed to advise two truck drivers that their schedules had been altered, resulting in both drivers arriving at the same station.

Finally, on June 18, 1992, Lawson received a telephone call from an individual named "Mike" saying that he would not be working that day because he was sick. Lawson did not ask for "Mike's" surname and instead assumed that "Mike" was Mike Evangelho ("Evangelho"), a gasoline driver at the Newark Terminal. Lawson then called an outside contractor to replace Evangelho for the day. In fact, Mike Trezza, a lube oil cargo driver, had called in sick rather than Evangelho. By hiring the outside contractor to replace Evangelho, Rodgers alleges that Lawson took work away from a Getty driver.

On May 19, 1992, Lawson completed his probationary period. In a memorandum dated June 19, 1992 to Paul J. Stendardi ("Stendardi"), director of terminals and transportation, Rodgers listed several examples of Lawson's allegedly substandard performance during his probationary period. *See* memorandum from Rodgers to Stendardi of 6/19/92, annexed to the Exhibits as Exh. "V." Rodgers indicated further that:

> Fred Lawson's reply, when confronted with these problems, is that they are honest mistakes and that he is trying his best. I am sure that they are honest mistakes, as opposed to "dishonest" mistakes; however they are mistakes that happen to [sic] frequently and they can no longer be tolerated. Fred Lawson is obviously *not* qualified to be a Terminal Supervisor and I therefore request that we terminate him immediately!!

*Id.* at 3 (emphasis in original).

That same day, Lawson was terminated

from employment. On September 3, 1993,[4] Lawson was replaced by Dennis E. London ("London"), an African–American male who had been employed with Getty since 1985 as a wholesale credit coordinator.

## IV. The Current Action

In the interim, on May 11, 1993, Lawson commenced this action claiming employment discrimination, pursuant to 42 U.S.C. §§ 1981 and 1983,[5] Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972 ("Title VII"), and 42 U.S.C. § 2000e *et seq.* Plaintiff claims that defendants' actions in subjecting him to a discriminatory standard for advancement to the day shift and in terminating his employment constitute intentional and/or negligent infliction of emotional distress and interference with a business opportunity. Plaintiff alleges further that defendants intentionally engaged in patterns and practices of discrimination with respect to plaintiff's terms, conditions and privileges of employment because of plaintiff's race and in retaliation for plaintiff's complaint to Getty's human resources department. The complaint seeks declaratory and injunctive relief, compensatory damages in excess of $3,000,000, punitive damages in excess of $7,000,000, costs and attorney's fees.

Lawson contends that he was subjected to many instances of discrimination during the course of his employment at Getty. For instance, he contends that when Getty promoted Gallucci, a white male, to the position of terminal supervisor, Gallucci commenced employment at a higher salary than Lawson, and immediately was placed on a 401–K pension plan. By contrast, Lawson contends that he was subjected to a waiting period before being placed on the company's 401–K pension plan.

Lawson also contends that Rodgers and Stendardi engaged in racial epithets against him, thus demonstrating their discriminatory intent in terminating him from employment.

In support of this contention, Lawson points to Bittner's affidavit, in which Bittner alleges that he was present at a meeting between Rodgers and Stendardi. When Rodgers asked Stendardi: "What am I going to do with them," referring to Lawson and Smith, Stendardi's reply was: "Get rid of the niggers." *See* the Bittner Aff. at ¶¶ 4, 5.

According to Bittner, two other Getty executives made discriminatory remarks regarding Lawson. Specifically, Harry Hudak, a terminal supervisor in Paulsboro, New Jersey, and Phil Long, a terminal superintendent, referred to Lawson as a "dumb nigger" and a "stupid nigger." In addition, Janovsky, a former terminal foreman at Getty, alleges that he encountered racial epithets directed at Lawson. Specifically, Janovsky alleges that Cody, Getty's terminal foreman, and Cliff Wesner, a supervisor, stated: "Ah! we got another dumb nigger here! It was bad enough with Willie Smith—Now we have Fred Lawson." *See* the Janovsky Aff. at ¶ 3.

Defendants now move, pursuant to Federal Rule of Civil Procedure 56, for summary judgment dismissing the complaint in its entirety. Alternatively, defendants move for partial summary judgment (1) dismissing that portion of the complaint that fails to establish a *prima facie* case; (2) dismissing plaintiff's claim for punitive damages; and (3) limiting compensatory damages to the sum of $50,000.

## DISCUSSION

### I. Standard for Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, a motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must

---

4. Neither party has offered an explanation as to why Lawson was not replaced prior to September 1993.

5. Plaintiff concedes that Getty is a private employer and did not act under color of state law in discharging Lawson from employment. Accordingly, defendants' motion for summary judgment dismissing that portion of plaintiff's complaint that states a cause of action under 42 U.S.C. § 1983 is granted.

initially satisfy a burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986); *see also Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1223 (2d Cir.1994). The nonmoving party then must meet a burden of coming forward with "specific facts showing that there is a genuine issue for trial," Fed.R.Civ.P. 56(e), by "a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. at 2552.

The Court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Eastway Constr. Corp. v. New York*, 762 F.2d 243, 249 (2d Cir.1985); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970); *Hathaway v. Coughlin*, 841 F.2d 48, 50 (2d Cir.1988); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The Court is to inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for the party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), however, and to grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative. *Id.* at 249–50, 106 S.Ct. at 2510–11; *Knight v. United States Fire Ins. Co.*, 804 F.2d at 12, 15; *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir.1986), *cert. denied*, 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987).

▮ To defeat a defendant's properly supported motion for summary judgment in a race discrimination case, a plaintiff must establish a material issue of fact "as to whether (1) the employer's asserted reason for discharge is false or unworthy of belief *and* (2) more likely than not the employee's [race] was the real reason for the discharge." *Wo-*

*roski v. Nashua Corp.*, 31 F.3d 105, 108–09 (2d Cir.1994) (emphasis in original). Where the material fact at issue is an employer's intent, summary judgment should be used sparingly. *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d at 1224; *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir.1988). "Because writings directly supporting a claim of intentional discrimination are rarely, if ever, found among an employer's corporate papers, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d at 1224.

## II. The *McDonnell Douglas* Standard

▮ In order to establish a *prima facie* case of discrimination based on race, a plaintiff must satisfy the standard set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) ("*McDonnell Douglas*").[6] Under this standard, the plaintiff must establish that he (1) belongs to a protected class; (2) was qualified for the position; (3) was discharged; and (4) was replaced by a non-minority worker. *Carter v. AT & T Communications*, 759 F.Supp. 155, 159 (S.D.N.Y.1991). The final element of the *prima facie* case may be satisfied "by proof that plaintiff was replaced by a non-minority worker, or, if plaintiff was not replaced, by proof that non-minority workers with comparable work records were retained while plaintiff was terminated." *Wade v. New York Tel. Co.*, 500 F.Supp. 1170, 1174 (S.D.N.Y.1980) (quotations omitted). The burden of establishing a *prima facie* case "is not onerous." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

▮ Once the plaintiff establishes a *prima facie* case, an inference of employment discrimination arises, *id.* at 254, 101 S.Ct. at 1094 (1981); *see also Patterson v. McLean Credit Union*, 491 U.S. at 187, 109 S.Ct. at 2378, and the burden shifts to the defendants to rebut the presumption of discrimination by

---

6. The *McDonnell Douglas* scheme of proof also applies to claims of racial discrimination under Section 1981. *See Patterson v. McLean Credit*

*Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 2377, 105 L.Ed.2d 132. (1989).

producing evidence that the plaintiff was rejected for a legitimate, nondiscriminatory reason. *McDonnell Douglas Corp. v. Green,* 411 U.S. at 802, 93 S.Ct. at 1824; *Texas Community Affairs v. Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. If defendants are able to rebut the presumption of discrimination, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the reasons set forth by the defendants are merely pretextual and not the true reasons for plaintiff's disqualification and termination. *McDonnell Douglas Corp. v. Green,* 411 U.S. at 804, 93 S.Ct. at 1825; *see also Patterson v. McLean Credit Union,* 491 U.S. at 187, 109 S.Ct. at 2378; *Texas Community Affairs v. Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. "[T]he Title VII plaintiff at all times bears the 'ultimate burden of persuasion'" that the defendants' actions were motivated by improper discriminatory intent. *St. Mary's Honor Ctr. v. Hicks,* — U.S. —, —, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993).

### III. Plaintiff's *Prima Facie* Case

 Defendants contend that plaintiff has not established by a preponderance of the evidence a *prima facie* case of discrimination. Specifically, defendants argue that plaintiff has failed to demonstrate either that he was qualified for the position of terminal supervisor or that he was replaced by a nonminority worker.[7] While the burden of establishing a *prima facie* case is not "onerous," *see Texas Dep't of Community Affairs v. Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093, the Court concludes that Lawson has made no attempt to satisfy his burden of proving that he was qualified for the position of terminal supervisor at Getty. In addition, the evidence clearly shows that plaintiff was replaced by another minority worker.

Specifically, defendants contend that Lawson was placed on the night shift and subsequently discharged because of his poor job performance. In support of this contention,

defendants list specific instances in which Lawson performed the job of terminal supervisor inadequately, including, *inter alia,* Lawson's failure to (1) reconcile inventory; (2) complete reports; (3) follow safety procedures; and (4) inform drivers of schedule changes. In addition, defendants point to a letter written by Smith after Lawson's discharge in which Smith recorded specific instances of Lawson's poor performance. *See* letter from Smith of 8/12/92, annexed to the Exhibits as Exh. "R." In the letter, Smith indicates that "[f]rom time to time it became necessary to remind Mr. Lawson of performing work below standard." *Id.* Smith then listed several instances of Lawson's misconduct, including his failure to (1) identify the worker who had called in sick on June 18, 1992; (2) complete plant inventory gauges; (3) update schedules; and (4) relay information. He concluded that "[t]hese are a few of the things which meant steady counseling for Mr. Lawson." *Id.*

 In response to these allegations, Lawson merely points to the affidavits of Janovsky and Bittner who describe Lawson as "hardworking, cooperative, sincere, and dedicated," Janovsky Aff. at ¶ 4, and "intelligent, competent, and hard working." Bittner Aff. at ¶ 6. As these individuals did not act in a supervisory capacity, however, the Court concludes that Bittner's and Janovsky's descriptions of Lawson's job performance are entitled to little weight.[8]

The Court finds Smith's letter to be credible evidence of Lawson's poor job performance and demonstrates that the defendants discharged Lawson because of his substandard work. In reaching this conclusion, the Court notes that Smith is an African-American male who was Lawson's direct supervisor. As Lawson has made no effort to refute either Smith's letter or defendants' other evidence of Lawson's poor job performance, the Court finds that Lawson has failed to demonstrate that he was qualified for the position of terminal supervisor.

---

7. The parties do not dispute that, as an African-American, plaintiff is a member of a protected class. The evidence also demonstrates that Lawson was, in fact, terminated from employment.

8. The Court notes that Bittner's and Janovsky's credibility are questionable in light of the fact that Bittner was discharged from employment in April 1993 and Janovsky was terminated from employment in August 1988.

■ Lawson points to instances in which several Getty employees engaged in racial slurs as evidence that the defendants were motivated by discriminatory animus in refusing to advance him to the day shift and in terminating his employment. "Racially derogatory language in the workplace can be evidence of a discriminatory atmosphere, and is certainly not to be condoned." *Powell v. Missouri State Highway and Transp. Dep't*, 822 F.2d 798, 801 (8th Cir.1987); *see also Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir.1987) (stating that a work environment overrun by racial antagonism constitutes a Title VII violation). Nonetheless, while the racial epithets aimed at Lawson were deplorable, these isolated racial remarks do not satisfy plaintiff's burden of establishing a *prima facie* case of discrimination. *See Snell v. Suffolk County*, 782 F.2d 1094, 1102 (2d Cir.1986) (stating that a few isolated incidents of racial enmity do not give rise to a Title VII violation); *Bennett v. New York City Dep't of Corrections*, 705 F.Supp. 979, 982 (S.D.N.Y.1989) (indicating that, in order to prove a racially hostile atmosphere, a plaintiff must prove more than a few isolated instances of racial friction).

■ Lawson next contends that the "little mistake[s]" he made in the course of his employment were not surprising in light of the fact that he never received training for the position of terminal supervisor. *See* Plaintiff's Memorandum of Law in Opposition to Motion for Summary Judgment at 5. While there is no evidence that Lawson received the six months of training given to other terminal supervisors, Lawson held the position of terminal foreman and terminal supervisor for more than six years. Moreover, in March 1992, in response to his request, Lawson was given a job description of his position and acknowledged that he fully understood his job responsibilities. Accordingly, the Court concludes that Lawson's lack of training does not excuse the fact that he was not qualified for the position of terminal supervisor.

The Court finds further that plaintiff has failed to satisfy the fourth prong of the test for a *prima facie* case, namely, that Getty replaced plaintiff with a non-minority worker.

*See La Beach v. Nestle Co.*, 658 F.Supp. 676, 683–84 (S.D.N.Y.1987) (granting summary judgment to defendant where plaintiff failed to demonstrate that white employees of plaintiff's qualifications were promoted). In fact, in September 1993, Lawson was replaced by London, an African–American male who had been employed with Getty since 1985 as a wholesale credit coordinator. Accordingly, as plaintiff has failed to establish either that he was qualified for the position of terminal supervisor or that he was replaced by a non-minority worker, he has not satisfied his burden of proving a *prima facie* case of discrimination.

## IV. Disparate Impact

■ Lawson's complaint alleges that defendants' practice of moving terminal supervisors from the night shift to the day shift and then to other locations at higher rates of pay violates Title VII because it has a disparate impact on minority workers. Title VII prohibits discrimination resulting from employment practices that are facially neutral but have a "disparate impact" "because they fall more harshly on a protected group than on other groups and cannot otherwise be justified." *Waisome v. Port Auth. of N.Y. and N.J.*, 948 F.2d 1370, 1374 (2d Cir.1991); *Bridgeport Guardians, Inc. v. City of Bridgeport*, 933 F.2d 1140, 1146 (2d Cir.), *cert. denied*, 502 U.S. 924, 112 S.Ct. 337, 116 L.Ed.2d 277 (1991). To prove that an employment practice has a disparate impact, "a plaintiff must first identify the specific employment practice he is challenging, and then show that the practice excluded him or her, as a member of a protected group, from a job or promotion opportunity." *Waisome v. Port Auth. of N.Y. and N.J.*, 948 F.2d at 1375 (citations omitted); *see also Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 657, 109 S.Ct. 2115, 2125, 104 L.Ed.2d 733 (1989) ("As a general matter, a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack.").

■ To avoid a finding of disparate impact, the employer then must demonstrate that the employment practice was used for nondiscriminatory reasons, "for example, the

practice serve[d] the employer's legitimate employment goals." *Waisome v. Port Auth. of N.Y. and N.J.*, 948 F.2d at 1375. Once an employer demonstrates a lawful goal for the employment practice, the burden then shifts back to the plaintiff to set forth alternative employment practices that would reduce the disparate impact. *Id.; Bridgeport Guardians, Inc. v. City of Bridgeport*, 933 F.2d at 1147.

■ In the instant case, Lawson alleges that defendants treated him in a disparate manner from his white colleagues in precluding him from working on the day shift. Plaintiff has failed to allege any particular employment practice, however, whereby employees were moved from the night shift to the day shift and then were moved out to different locations with a corresponding increase in salary. Rather, the evidence submitted by defendants shows that terminal supervisors on the day and the night shifts shared identical positions and titles and that an employee's salary was a reflection of that individual's prior experience and length of employment at Getty. In fact, plaintiff's complaint alleges that "those white colleagues who moved to the day shift moved up, were not necessarily promoted because they retained the same job title and did the same work." Complaint, annexed to the Exhibits as Exh. "A," at ¶ 18.[9]

Moreover, even if Lawson had successfully isolated a challenged employment practice, he failed to provide the Court with any statistical data showing that defendants' promotion policies have a disparate impact. *See La Beach v. Nestle Co.*, 658 F.Supp. at 684 (finding for defendant where plaintiff failed to provide any statistics showing a disparate impact). In fact, no evidence was offered comparing the number of minorities placed permanently on the night shift to the number of non-minorities posted on the day shift. Lawson thus failed to prove a causal connection between the challenged employment

practice and any disparate impact. *See Virgo v. Local Union 580*, 629 F.Supp. 1204, 1209 (S.D.N.Y.1986) (finding evidence of a disparate impact on blacks as a group to be wholly lacking). Accordingly, the Court finds that plaintiff has failed to establish a *prima facie* case of disparate impact.

## V. Retaliation

■ Plaintiff's complaint next alleges that Getty retaliated against him for bringing his allegations of discrimination to the attention of Getty's human resources department. Title VII "prohibits an employer from subjecting an employee to an adverse employment action in retaliation for that employee's opposition to allegedly discriminatory employment practices." *McGuire v. U.S. Postal Serv.*, 749 F.Supp. 1275, 1281 (S.D.N.Y. 1990). To establish a *prima facie* case of retaliation under Title VII, a plaintiff must demonstrate (1) protected participation or opposition under Title VII that is known by the alleged retaliator; (2) an employment action disadvantaging the person engaged in the protected activity; and (3) a causal connection between the protected activity and the adverse employment action. *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir.1980).

> Proof of causal connection can be established *indirectly* by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or *directly* through evidence of retaliatory animus directed against a plaintiff by the defendant.

*De Cintio v. Westchester County Medical Ctr.*, 821 F.2d 111, 115 (2d Cir.) (internal citations omitted), *cert. denied*, 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987).

■ In the present case, plaintiff has failed to provide the Court with either direct

---

**9.** Lawson argues that the fact that Gallucci commenced employment at a higher salary and with better benefits proves that Getty's employment practice had a disparate impact. According to the defendants, however, Gallucci's salary and benefits level were determined by virtue of his past employment at Getty's Mount Vernon Terminal. In addition, when Gallucci was transferred back to the Mount Vernon Terminal, he retained the same rate of pay. Accordingly, Gallucci's subsequent transfer back to the Mount Vernon Terminal is not evidence of a particular employment practice, but rather, was the result of Gallucci's unique employment history.

or indirect evidence of any causal connection between his complaint to the human resources department and either his placement on the night shift or his termination from employment. First, Lawson has not demonstrated evidence of any retaliatory animus directed against him.[10] Second, Lawson has failed to set forth any evidence of disparate treatment of fellow employees who engaged in similar conduct. Finally, Lawson has not established that his failure to be placed on the day shift was prompted by his complaints to the human resources department. On the contrary, the fact that Lawson was placed permanently on the night shift was the impetus for his complaint to the human resources department in the first place. Similarly, with respect to his discharge, Rodgers performed an annual review of Lawson's job performance, indicating that his work was between "competent" and "marginal," on January 27, 1992, several weeks before Lawson contacted the human resources department. In addition, prior to his complaint, Rodgers informed Lawson that he was dissatisfied with Lawson's performance and that Lawson would be placed permanently on the night shift because of his poor performance. Furthermore, on February 11, 1992, four days prior to Lawson's complaint, Smith verbally counselled Lawson regarding his failure to perform his required job duties. In light of these facts, the Court finds that plaintiff has failed to make a causal connection necessary to prove a *prima facie* case of retaliation.

## VI. State Law Claims

As plaintiff's federal claims for employment discrimination fail, there is no further basis for federal jurisdiction. In addition, the complaint does not allege diversity jurisdiction and it appears that diversity of citizenship is lacking between the parties. *See* 28 U.S.C. § 1332. Accordingly, plaintiffs' state claims of intentional and/or negligent infliction of emotional and psychological harm, humiliation and embarrassment and interference with a business opportunity are dismissed for lack of subject matter jurisdiction. *See Howe v. Reader's Digest Ass'n,* 686 F.Supp. 461, 467 (S.D.N.Y.1988) (dismissing pendent state law claims for lack of jurisdiction after granting summary judgment dismissing plaintiff's federal claims).

## CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, is granted and the complaint is dismissed in its entirety.

SO ORDERED.

---

**10.** While Lawson has submitted evidence of racial slurs, the Court finds that these remarks do not rise to the level of retaliatory animus. First, while Bittner's affidavit alleges that Rodgers and Stendardi made derogatory remarks regarding Lawson and Smith, Bittner did not indicate whether these remarks were made prior to Lawson's complaint to the human resources department. Second, with respect to the racial epithets made by Hudak, Long, Cody and Wesner, it is unclear from the record whether these individuals knew that Lawson had complained to the human resources department. In any event, as these individuals did not supervise Lawson, they did not have the authority to engage in any adverse employment action as a result of Lawson's complaint. Accordingly, while the Court does not condone the comments allegedly made by Getty's employees, the Court finds that the foregoing remarks do not constitute of evidence of retaliatory animus.