**Marie Louise GUEYE, Plaintiff,**

v.

**AIR AFRIQUE, Defendant.**

**No. 92 Civ. 6625 (SWK).**

United States District Court,
S.D. New York.

March 4, 1996.

Roosevelt Seymour, Brooklyn, New York, for Plaintiff.

Zuckert, Scoutt & Rasenberger by Andrew R. Plump, Washington, DC, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KRAM, District Judge.

In this employment discrimination action, plaintiff Marie Louise Gueye ("Gueye") charges defendant Air Afrique with discriminating against her on the basis of age and race and retaliating against her for filing a discrimination claim, in violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §· 621, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and New York Executive Law § 296. Gueye seeks back pay, front pay, lost pension benefits, compensatory damages for emotional suffering, punitive damages, liquidated damages and an award of attorney's fees. On January 29 through February 1, 1996, the Court held a bench trial on Gueye's claims.[1]

---

1. By Memorandum Opinion and Order dated   April 19, 1995, the Court granted Air Afrique's

As set forth fully in the following findings of fact and conclusions of law, the Court finds in favor of defendant.

## FINDINGS OF FACT

### I. The Parties

Air Afrique is an airline company owned by a consortium of ten West African nations. Its headquarters are in Abidjan, Ivory Coast, and it maintains offices throughout the world, including an office in Manhattan, New York (the "Manhattan office")[2] and a cargo office near John F. Kennedy Airport in Queens, New York (the "Queens office").

On August 12, 1985, Youssou Diagne ("Diagne"), the director of the North American office of Air Afrique, hired Gueye, a black female in her mid-fifties, to work as his executive secretary in the Manhattan office. Gueye possessed many years of secretarial experience prior to her employment at Air Afrique, including several years in the employ of the Organization of African Unity. At the time Gueye commenced work at Air Afrique, the Manhattan office was relatively small, consisting of seven employees in the following positions: (1) Diagne (director); (2) Charles Librader ("Librader") (commercial manager); (3) Chantal Manners ("Manners") (finance manager); (4) Peter Lintner ("Lintner") (sales representative); (5) Eliane Kaiser ("Kaiser") (secretary); (6) Michelle Smarth ("Smarth") (receptionist/secretary); and (7) Gueye (secretary). Def.'s Trial Exh. ("DX") "OO."

In January 1986, Diagne assigned Gueye the job of interline representative in addition to her normal secretarial duties. The interline representative is primarily responsible for processing requests by Air Afrique employees to travel on other airlines and by employees of other airlines to travel on Air Afrique. Gueye replaced Manners, a white female in her late fifties, who had been working for Air Afrique since 1965 and who at that time was serving as interline representative as part of her role as Air Afrique's finance manager.

### II. Management Changes

In 1988, Air Afrique experienced financial difficulties and the company's member nations decided to bring in a new management team to operate the airline. The new management group was headed by Yves Yoland–Billecarte, a white French citizen who had prior business experience dealing with several of the African nations that own Air Afrique. In September 1989, as part of Air Afrique's restructuring plan, Fernand Brigaud ("Brigaud"), an individual of mixed African and French lineage, replaced Diagne as Air Afrique's Director–North America. As Gueye remained in her position as secretary to the director of the Manhattan office, Brigaud immediately became Gueye's new supervisor.

The reorganization at Air Afrique resulted in several changes directly affecting the Manhattan office. Most significantly, effective January 1990, Air Afrique decided to cancel a major contract with France's national airline, Air France. Under the old contract, Air France had performed many vital functions for Air Afrique such as processing reservations, sales and claims. With the cancellation of the Air France contract, Brigaud decided to institute several fundamental changes so that the Manhattan office could assume those functions which previously had been performed by Air France personnel. Trial Tr. at 245. For example, Brigaud reassigned existing personnel and redefined their responsibilities, hired additional employees for newly created positions and leased new space at the Manhattan office so that Air

---

motion for partial summary judgment dismissing Gueye's discrimination claim to the extent it is based on (1) Air Afrique's decision to deny her a salary increase in 1987 and 1988; (2) Air Afrique's failure to reimburse plaintiff's medical expenses between 1985 and 1988; and (3) a claim for damages under 42 U.S.C. § 1981 for conduct occurring prior to November 21, 1991. Consequently, these claims were not presented at trial and shall not be discussed below.

**2.** The term "Manhattan office" is used to refer both to Air Afrique's office initially located at 985 Fifth Avenue and its new office located at 888 Seventh Avenue to which all Manhattan employees were moved shortly after Gueye was hired by Air Afrique.

Afrique occupied space on the 27th floor in addition to its prior space on the 30th floor.

With respect to hirings, terminations and reassignments, Brigaud took several actions. Brigaud first fired Librader, and eliminated his position as commercial manager in part so that he could maintain more direct contact with the other employees. *Id.* at 247, 352–53. Brigaud next hired two additional sales representatives, both white men in their early forties, to work with Lintner, the only other existing sales representative in the Manhattan office. At the same time, Brigaud hired Nadine Archer, a thirty-year-old black woman, to fill the position of commercial administrator, a new position responsible for overseeing travel agency sales of Air Afrique tickets.

Brigaud also decided to reassign two current employees to new positions in the company. Specifically, Brigaud reassigned Smarth, a black woman in her mid-thirties, to work as secretary to the three sales representatives because she no longer had any work to do for Librader and there was insufficient work to occupy her time as a receptionist. *Id.* at 252–53. Brigaud also transferred Kaiser, a white woman in her early forties, to work in group reservations because she had some relevant experience in the group sales area. *Id.* at 253–54. At the same time, Brigaud hired Jeanette Nachef ("Nachef"), a thirty-three-year-old white woman, to replace Smarth as the new receptionist/secretary. Brigaud gave both Smarth and Kaiser small raises to reflect their added responsibilities. *Id.* at 255. Although it appears that Gueye was not afforded the opportunity to apply for these jobs, she in fact subsequently stated that she did not desire a promotion to either position. *Id.* at 139–42.

During Brigaud's tenure as the North American director between 1989 and 1994, the composition of the employees by age and race did not change in any material way despite the substantial personnel overhaul at Air Afrique. Thus, the twelve original employees other than Brigaud included four blacks and eight whites, and included four employees in their thirties, four in their forties and four in their fifties. DX "OO." During Brigaud's five-year tenure, twenty-three new employees were hired for the Manhattan and Queens offices. These new employees consisted of twelve whites, eight blacks, one hispanic, one Asian and one individual of mixed black and Asian heritage. DX "PP." As for the ages of the new hirees, they break down as follows: four in their twenties, nine in their thirties, eight in their forties and two in their fifties. *Id.*

During this period of reorganization at the Manhattan office, Brigaud instituted two other changes relevant to the present lawsuit. First, in January 1990, he instituted a new system of responsibility for answering Air Afrique's general telephone line on the 30th floor because the personnel changes reduced the number of secretaries on that floor. Trial Tr. at 255–57. Under the new system, outlined in a memorandum to all employees, Gueye, the only remaining secretary on the 30th floor, became responsible for answering the general telephone whenever Nachef, the receptionist, was at lunch or otherwise unavailable. DX "A." Gueye continued to hold this responsibility after Nachef was transferred and a new receptionist hired in her place. Trial Tr. at 263–64.

Second, in November 1990, Brigaud decided to remove the interline responsibility from Gueye and return it to Manners, who previously had held the position. Brigaud took this action because he felt that Gueye's workload was overwhelming, he had received several complaints about Gueye's performance as the interline representative, and the interline position typically is filled by administrative and accounting personnel rather than by secretarial employees at Air Afrique. *Id.* at 279–83, 366. Brigaud decided that Manners should reassume the responsibility because of her experience as interline representative and since it appeared that the additional workload would not be unduly burdensome. *Id.* at 282. At that time, Brigaud gave Gueye certain other responsibilities, including verifying passenger immigration information and performing "overrides," a process dealing with commissions for travel agents and tour operators. *Id.* at 118–21, 124–26, 283–85.

In his capacity as Director–North America, Brigaud was responsible for disciplining em-

ployees when necessary and, he did in fact take some disciplinary actions against employees during the relevant time period. For example, in November 1990, Brigaud sent Gueye a written warning based on his observation that she regularly failed to arrive at work on time and often extended her lunch break beyond the allotted time period. *Id.* at 269–74; DX "D." On another occasion, Brigaud issued Smarth a letter warning for failing to abide by certain work rules and later suspended her for five days without pay. Trial Tr. at 276–77; DX "JJ," "KK." In another instance, Brigaud verbally reprimanded Nachef for mistreating Gueye during a brief altercation between the two employees. Trial Tr. at 137–38, 289–90.

On June 13, 1991, Gueye filed a complaint with the New York State Division of Human Rights setting forth a claim for discrimination on the basis of race and age (the "DHR Complaint"). In the DHR Complaint, Gueye alleged that Brigaud's decisions to promote younger employees and remove her title as interline representative were motivated by a discriminatory intent.

## III. Gueye's Reassignment

In November 1991, an altercation occurred involving Brigaud and Gueye. The credible evidence established that Gueye refused Brigaud's direction to answer the telephone to speak to a customer, and a disagreement ensued in which Gueye raised her voice and engaged in other insubordinate behavior. *Id.* at 286–88, 455–57. Brigaud immediately suspended Gueye for five working days. *Id.* at 288; DX "I." Shortly thereafter, Brigaud transferred Gueye to the Queens office based on his belief that Gueye could no longer work effectively in any position in the Manhattan office. Trial Tr. at 291–93. On November 21, 1991, Gueye amended the DHR Complaint to include a retaliation claim based on the transfer decision.

At the Queens office, Gueye was supervised by Marie Jose Neptune ("Neptune"), Air Afrique's cargo manager. Gueye was immediately assigned the job of performing several secretarial tasks such as typing, preparing statistical reports and answering the telephone. *Id.* at 390. Neptune soon determined, however, that Gueye was not successfully performing her telephone responsibilities due to her difficulty speaking and understanding English. *Id.* at 393–95. Accordingly, in February 1992, Neptune decided to relieve Gueye of that responsibility and instead assigned her the task of processing claims of damaged and lost baggage, a job recently transferred from the Manhattan office. *Id.* at 396–97.

Air Afrique officials agreed to the change and proposed that Gueye be sent to New World Cargo, the company contracted by Air Afrique to transport excess baggage, for two weeks of training followed by additional training in Abidjan. *Id.* at 397–98. Neptune and Brigaud disagreed with headquarters' proposal and instead suggested that Gueye be trained first in Abidjan and later at New World Cargo. *Id.* at 398–400. Officials at Abidjan accepted this plan and authorized Gueye's travel to their training facilities. *Id.* at 400. The credible evidence established that Neptune and Gueye together agreed on convenient travel dates and that Gueye was aware of the trip several weeks prior to departure. *Id.* at 400–07.

On May 18, 1992, Gueye returned to work at the Queens office, having completed her training in Abidjan. That day, a dispute ensued between Gueye and Neptune involving Gueye's responsibilities and the training she had received at headquarters. During the course of the altercation, Gueye became enraged, refused to discuss her training and challenged Neptune's supervisory authority. *Id.* at 407–16, 472–77. In view of Gueye's insubordination, Neptune immediately gave Gueye written notification that she was suspended indefinitely. *Id.* at 417; DX "R." On May 25, 1992, after consultation with officials in Abidjan, Brigaud terminated Gueye's employment. Trial Tr. at 373–75.

## CONCLUSIONS OF LAW

### I. Discrimination Claim

In order to establish a case of discrimination based on race or age, a plaintiff must satisfy the standard set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05, 93 S.Ct. 1817,

1824–26, 36 L.Ed.2d 668 (1973).[3] *See Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 507 (2d Cir.1994) (stating that ADEA claims are analyzed in the same manner as Title VII claims). Under this standard, the plaintiff must establish that she (1) is a member of a protected class; (2) was qualified to perform the duties required by the position; and (3) suffered an adverse employment action under circumstances suggesting that race or age was a factor. *Id.* at 508 (citing *Levin v. Analysis & Technology, Inc.,* 960 F.2d 314, 316 (2d Cir.1992)); *Rosen v. Thornburgh,* 928 F.2d 528, 532 (2d Cir. 1991).

■ Once the plaintiff establishes a *prima facie* case, an inference of discrimination arises, and the burden shifts to the defendant to rebut the presumption of discrimination by producing evidence that the employer's actions were motivated by legitimate, nondiscriminatory reasons. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. at 802, 93 S.Ct. at 1824. If the defendant is able to rebut the presumption of discrimination, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the reasons set forth by the defendant are merely pretextual and not the true reasons for the adverse employment action. *McDonnell Douglas Corp. v. Green,* 411 U.S. at 804, 93 S.Ct. at 1825; *see also Patterson v. McLean Credit Union,* 491 U.S. 164, 187, 109 S.Ct. 2363, 2378, 105 L.Ed.2d 132 (1989); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

■ In meeting this standard, the plaintiff need not prove that race or age was the only factor motivating the employer's conduct, but rather that it was a " 'determinative factor.' " *Robinson v. Overseas Military Sales Corp.,* 21 F.3d at 508 (age) (quoting *Levin v. Analysis & Technology, Inc.,* 960 F.2d at 317); *Murray v. City of Sapulpa,* 45 F.3d 1417, 1421 (10th Cir.1995) (race). At all times, however, the plaintiff has the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against her. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993).

In the present case, Gueye alleges that the following adverse employment actions were taken against her as a result of her age or race: (1) Brigaud promoted Smarth and Kaiser rather than Gueye during the transition period at Air Afrique; (2) Brigaud required her to answer the general telephone line when the receptionist was unavailable; (3) Gueye was singled out for discipline for time and leave problems; and (4) Brigaud transferred the interline representative title from her to Manners. After considering all relevant evidence presented at trial, however, the Court finds that these employment actions were wholly unrelated to Gueye's age or race.

■ First, on the issue of promotions to Smarth and Kaiser, Gueye has failed to carry her burden of proving that Air Afrique's decisions were based on age or race. Rather, the evidence presented at trial overwhelmingly established that these promotions were based on legitimate business considerations. In the case of Smarth, Brigaud's decision was based on the departure of Librader, upon whom Smarth previously had depended for much of her workload. As for Kaiser, the decision appears to have been based on her prior experience dealing with some issues relevant to group sales. Gueye failed to present any evidence, direct or circumstantial, that these promotion decisions were motivated by a discriminatory animus. Additionally, the fact that Smarth is black undermines Gueye's contention that Brigaud's decision was racially motivated. The Court also discredits Gueye's testimony that she would have sought the promotion given to Kaiser, as her in-court testimony is belied by her own prior deposition testimony in which she stated that she did not desire that position.

■ Second, with respect to the decision to require Gueye to answer the general tele-

---

**3.** New York state courts have adopted the *McDonnell Douglas* analysis for discrimination claims arising under New York State Human Rights Law. *Song v. Ives Lab., Inc.,* 957 F.2d 1041, 1046 (2d Cir.1992).

phone line, the evidence presented at trial clearly established that Brigaud was not motivated by an impermissible consideration such as Gueye's age or race. Brigaud credibly testified that his decision was based on personnel changes in the Manhattan office, which rendered Gueye the most logical choice to assume the responsibility of assisting the receptionist.

■ Third, Gueye has failed to sustain her burden of proving that Brigaud's decision to remove her title of interline representative was motivated by race. Plaintiff simply presented no evidence to support her claim that Brigaud was motivated by racial considerations to any degree in returning the interline function to Manners. Rather, the Court finds that the decision was based on several legitimate considerations, including (1) Brigaud's determination that Gueye was overworked; (2) the fact that other employees had complained about her performance in the interline role; (3) Brigaud's recognition that the job is usually not performed by secretaries at other Air Afrique offices; and (4) the fact that Manners had experience in the position.

■ Fourth, contrary to plaintiff's claim, the evidence demonstrated that Gueye was not singled out for disciplinary action and, in fact, other employees were similarly reprimanded for violating firm policies. For example, during his tenure as the head of the Manhattan office, Brigaud disciplined Smarth, a younger woman, for certain leave problems and ultimately suspended her for several days without pay. In another instance, Brigaud verbally reprimanded Nachef, another younger employee, for failing to treat Gueye respectfully. Additionally, Brigaud at one point circulated a memorandum to all employees in the Manhattan office with a general warning about time and leave problems. DX "A." Together, this evidence strongly suggests that Brigaud's disciplinary decisions were reached without regard to the employees' age or race, but rather were based on whether or not individual disciplinary problems needed to be addressed.

As for plaintiff's contention that Brigaud failed to take any action against Manners despite the fact that she regularly exceeded her allotted lunch break, the Court does not find Gueye's testimony credible. Rather, the Court credits Brigaud and Manners' testimony that Manners limited her lunch break to the appropriate length of time. Trial Tr. at 275, 453–54. This allegation thus similarly fails to support Gueye's assertion that disciplinary action was based on age or race in the Manhattan office.

■ Finally, with regard to all four adverse employment actions alleged, the Court notes that a review of Brigaud's hiring practices during the relevant time period demonstrates further that his decisions were made irrespective of age and race. Brigaud hired individuals of various ethnic backgrounds, in roughly the same proportion as existed prior to his promotion to the head of the Manhattan office, including four black individuals prior to the filing of the DHR Complaint.[4] The employees hired by Brigaud ranged in age from twenty-two to fifty-five, and in fact nearly half of all hirees in the Manhattan and Queens offices were in their forties and fifties. This evidence, coupled with the Court's findings with respect to each of the four claims discussed above, supports the conclusion that Brigaud's employment decisions were made without regard to Gueye's age or race.

## II. Retaliation Claim

Turning to Gueye's claims for retaliation, the Court finds that plaintiff has failed to sustain her burden of proving that Air Afrique retaliated against her for filing the DHR Complaint.

■ Section 704(a) of Title VII provides, in part, that:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because [s]he has opposed any practice made an unlawful em-

---

4. The hiring statistics presented by Air Afrique also cast doubt on Gueye's credibility generally, as she previously stated in a sworn affidavit submitted to the Court that Brigaud refused to hire any blacks until after she filed the DHR Complaint.

ployment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a) (1988). The distribution and allocation of burdens of proof for retaliation claims follows the same analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802–05, 93 S.Ct. at 1824–26. *Gilman v. Runyon*, 865 F.Supp. 188, 191 (S.D.N.Y.1994). Thus, after the plaintiff establishes a *prima facie* case of retaliation, the defendant must articulate a "legitimate, nondiscriminatory reason" for its actions, at which point the plaintiff has the ultimate burden of proving that the proffered reason is merely a pretext for discrimination. *Id.*

■■■ With respect to the obligation to establish a *prima facie* case of retaliation, the plaintiff must demonstrate that (1) she was engaged in activity protected by Title VII; (2) the employer was aware of the plaintiff's participation in the protected activity; (3) the employer took adverse action against the plaintiff; and (4) a causal connection existed between the protected activity and the adverse action. *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993). Proof of a causal connection can be proved either directly through evidence of retaliatory animus or indirectly by showing that the protected activity was followed closely by the adverse action. *Id.; Lawson v. Getty Terminals Corp.*, 866 F.Supp. 793, 803 (S.D.N.Y.1994).

Gueye contends that the following adverse employment actions were taken in retaliation for filing the DHR Complaint: (1) Brigaud suspended Gueye for five days in November 1991 after the two had a disagreement over responding to the general office telephone; (2) Brigaud transferred Gueye to the Queens office, allegedly for the purpose of creating a difficult commute; (3) Neptune, Gueye's new supervisor in the Queens office, refused to notify her about the date of her training in Abidjan; (4) Neptune suspended Gueye indefinitely upon Gueye's return from training in Abidjan after a confrontation occurred regarding Gueye's training and her work re-

sponsibilities; and (5) Air Afrique terminated Gueye's employment.

Gueye has failed to sustain her burden of proving that any of these actions were taken as a result of her decision to pursue her discrimination claim. For each incident, Air Afrique presented substantial evidence at trial that its decisions were based on legitimate business reasons. The record is devoid of even the slightest credible indication that Air Afrique's proffered reasons are merely a pretext for retaliation.

■■■ First, with respect to Brigaud's decision to suspend Gueye for five days without pay, the Court finds that this decision was motivated solely by Gueye's insubordination in refusing to comply with Brigaud's directions. Gueye's assertion that Brigaud instigated the November 14th altercation to create an excuse to suspend her remains unconvincing. Rather, the Court credits the testimony of Brigaud, as fully supported by the testimony of Manners, a witness to the incident, that Gueye lost control and unjustifiably refused to obey Brigaud's instructions.

■■■ Second, the evidence does not support Gueye's claim that Brigaud transferred her to the Queens office as punishment for filing the DHR Complaint. The Court finds that Brigaud's decision was motivated by the reasonable need to ensure the effective operation of the Manhattan office. As for the type of work assigned to Gueye at the Queens office, the Court finds that the work was similar to the secretarial duties she had performed in the Manhattan office. Moreover, Air Afrique sought to train her in other areas of responsibility, including the baggage claim operations recently assigned from the Manhattan office. Under these circumstances, Brigaud's decision to transfer Gueye was legitimate and unrelated to the filing of the DHR Complaint.

■■■ Third, the credible evidence does not support Gueye's contention that Neptune intentionally withheld the details of the date of her trip to Abidjan for baggage claims training. In fact, Neptune and Gueye jointly planned the precise dates of departure and return, and Neptune even provided Gueye with the information necessary to reach the

training location upon her arrival in Abidjan. Trial Tr. at 405–07.

Finally, as for the parties' dispute regarding the altercation between Neptune and Gueye upon Gueye's return to the Queens office after her training in Abidjan, plaintiff again has failed to sustain her burden of establishing retaliation. Gueye's testimony that she calmly sought to have her responsibilities clarified in writing and otherwise cooperated with Neptune's instructions is simply not credible. Rather, the Court credits the testimony of Neptune and Kathleen Lubin, an employee in the Queens office and eyewitness to portions of their dispute, that Gueye became hysterical and openly insolent in refusing to cooperate with Neptune. The Court finds further that this latest act of insubordination, in conjunction with Gueye's other disciplinary problems, formed the sole basis for Air Afrique's decision to issue an indefinite suspension, and ultimately, to terminate her employment.[5] In sum, Air Afrique presented credible evidence that decisions by Brigaud and Neptune affecting Gueye's employment were based on legitimate business reasons and were not a pretext for retaliation.

## CONCLUSION

For the aforementioned reasons, the Court finds that Gueye has failed to sustain her burden of proving that Air Afrique discriminated against her on the basis of age or race, or retaliated against her for filing the DHR Complaint. Rather, upon careful consideration of all testimony and other evidence presented at trial, the Court finds that Air Afrique treated Gueye without regard to her age or race. Accordingly, the Court enters judgment for the defense, the amended complaint is dismissed and the case is ordered removed from the Court's active docket.

SO ORDERED.

---

5. As for Gueye's additional claims that Neptune refused to train her in certain computer skills and scuttled her baggage claims training, the Court finds Gueye's contentions to be without support in the record. As with her other claims, Gueye presents little credible evidence that Air Afrique was motivated by impermissible considerations such as race, age or retaliation.